UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA          Jacksonville, Florida

-vs-                              Case No. 3:23-cr-180-HES-JBT

NOAH MICHAEL URBAN               January 19, 2024
  a/k/a "Sosa"
  a/k/a "Elijah"                 3:34 p.m. - 4:30 p.m.
  a/k/a "Gustavo Fring"
  a/k/a "King Bob"               Courtroom 5A

       Defendant.                Digitally Recorded
_____

**DIGITALLY RECORDED ARRAIGNMENT/DETENTION**

BEFORE THE HONORABLE JOEL B. TOOMEY
UNITED STATES MAGISTRATE JUDGE

A P P E A R A N C E S

GOVERNMENT COUNSEL:

**JOHN CANNIZZARO**, **ESQUIRE**
United States Attorney's Office
300 North Hogan Street, Suite 700
Jacksonville, FL 32202

DEFENSE COUNSEL:

**KATHRYN SHELDON**, **ESQUIRE**
Federal Public Defender's Office
200 West Forsyth Street, Suite 1240
Jacksonville, FL 32202

OFFICIAL COURT REPORTER:

Katharine M. Healey, RMR, CRR, FPR-C
PO Box 56814
Jacksonville, FL 32241
Telephone: (904) 301-6843
katharinehealey@bellsouth.net

(Proceedings recorded by electronic sound recording;
transcript produced by computer.)

I N D E X

DEFENDANT ADVISED OF RIGHTS, CHARGES, PENALTIES,
AND SPECIAL ASSESSMENTS............................... PAGE 5

DEFENDANT ENTERS A PLEA OF NOT GUILTY AS TO
COUNTS ONE THROUGH FOURTEEN OF THE INDICTMENT......... PAGE 9

GOVERNMENT'S PROFFER AND ARGUMENT FOR DETENTION....... PAGE 11

DEFENDANT'S WITNESSES:

**ROBERT URBAN**

  DIRECT EXAMINATION BY MS. SHELDON.................... PAGE 23

  CROSS-EXAMINATION BY MR. CANIZZARO.................. PAGE 29

**JENNIFER WALCK**

  DIRECT EXAMINATION BY MS. SHELDON.................... PAGE 36

  CROSS-EXAMINATION BY MR. CANNIZZARO................. PAGE 39

DEFENDANT'S ARGUMENTS AGAINST DETENTION............... PAGE 41

GOVERNMENT'S MOTION FOR DETENTION GRANTED............. PAGE 43

P R O C E E D I N G S

January 19, 2024                                        3:34 p.m.

- - -

COURT SECURITY OFFICER:  All rise.  This Honorable Court is now in session.

Please be seated.

THE COURT:  We're here in the case *United States vs. Noah Michael Urban*.  And the defendant's present and his attorney, Ms. Sheldon, is here.  Mr. Cannizzaro is here for the government.  And the case number is 3:23-cr-180.

And we're here for an arraignment and a detention hearing.

And Madam Clerk, if you can swear in the defendant.

COURTROOM DEPUTY:  Please stand and raise your right hand.

Would you please stand?

Do you solemnly swear or affirm that the answers you will give during these proceedings will be the truth, the whole truth, and nothing but the truth, so help you God?

THE DEFENDANT:  (Inaudible.)

THE COURT:  I need to ask you some background questions again.

What's your full name?

THE DEFENDANT:  Noah Michael Urban.

THE COURT:  And what's your date of birth?

THE DEFENDANT:  August 31st, 2004.

THE COURT:  And how far did you go in school?

THE DEFENDANT:  High school and around a year of college.

THE COURT:  So you can read, write, and understand English?

THE DEFENDANT:  Yes, sir.

THE COURT:  Are you currently under the influence of any drugs, alcohol, intoxicants, or medication?

THE DEFENDANT:  No, sir.

THE COURT:  Are you currently under the care of a physician or a psychiatrist?

THE DEFENDANT:  No, sir.

THE COURT:  And are you currently receiving any medical or mental health care?

THE DEFENDANT:  No, sir.

THE COURT:  Have you ever been treated for any mental illness?

THE DEFENDANT:  Yes, sir.

THE COURT:  And when was that?

THE DEFENDANT:  Maybe six, seven years ago for anxiety.

THE COURT:  Okay.  And to your knowledge, do you now suffer from any mental or emotional disease or illness?

THE DEFENDANT:  No, sir.

THE COURT:  And do you clearly understand where you are, what you're doing, and the importance of this proceeding?

THE DEFENDANT:  Yes, sir.

THE COURT:  You should be aware that you have the following rights in this case:

You have a constitutional right to remain silent. You do not have to make any statement.  You do not have to give a statement at any time to any law enforcement officer or government agent.

If you do make a statement, anything you say can and will be used against you in court, including at a subsequent hearing or proceeding in this case.

If you've made a statement already in the past, you need not make any further statement in the future.

Do you understand your right to remain silent?

THE DEFENDANT:  Yes, sir.

THE COURT:  You have the right to plead guilty and by doing so to admit the truth of the charge or charges against you.

If you do so, there will be no trial, and on your plea the Court will find you guilty and will convict you.

The next step would be a presentence report and sentencing by the district judge.

You also have the right to plead not guilty and to maintain that plea.

If you plead not guilty you're entitled to the following rights under the Constitution and laws of the United States:

You have a right to a trial by a jury of 12 jurors, all of whom would have to unanimously agree on your guilt before you could be convicted.

Throughout these proceedings and all others you're presumed to be innocent.  And the government would have to overcome that presumption and prove you guilty beyond a reasonable doubt.

You would not have to prove that you're innocent.

At the trial the witnesses for the government have to come into court and testify in your presence.

Your attorney could cross-examine those witnesses, object to evidence offered by the government, and offer evidence on your behalf.

You may present witnesses in your own defense at your trial.  And if your witnesses will not come voluntarily, I could issue orders to make them come.

At the trial you have the right to testify if you choose to do so.  You also the right not to testify.  The choice is entirely up to you.  No one could force you to testify.

You have the right under the federal Speedy Trial Act to be brought to trial within a specified period of time.

Generally that means your trial must start within 70 days from January 10th, when you made your first appearance here, but there are exceptions, which your lawyer can explain to you.

If you're convicted you have the right to have a court of appeals review the rulings of the trial court to determine if your conviction or sentence should be reversed because either or both were improperly obtained.

Do you understand the rights I've explained?

THE DEFENDANT:  Yes, sir.

THE COURT:  And do you have any questions?

THE DEFENDANT:  No, sir.

THE COURT:  And have you received a copy of the indictment against you?

THE DEFENDANT:  Yes, sir.

THE COURT:  Okay.  I'm going to ask the government to again advise you of the charges contained in the indictment as well as the maximum and any minimum penalties.

And Ms. Sheldon, do you waive a full reading of the indictment?

MS. SHELDON:  Yes, Your Honor.  We can proceed by summary.

THE COURT:  Okay.

Mr. Cannizzaro.

MR. CANNIZZARO:  Thank you, Your Honor.

Mr. Urban, you are charged by an indictment for 14

counts, or 14 charges.  I'm going to go over each one of the different counts, or charges, against you along with the specifics when it comes to the minimum and maximum penalties.

Count One, you're charged with conspiracy to commit wire fraud.

Counts Two through Nine you are charged with substantive counts of wire fraud.

And then Counts Ten through Fourteen you are charged with aggravated identity theft.

So as far as the maximum penalties go, Counts One through Nine, conspiracy to commit wire fraud as well as the wire fraud charges themselves, those carry with it a maximum penalty of 20 years of imprisonment, a fine of up to $250,000, or a combination of imprisonment and a fine.  There's also a term of supervised release for up to three years.  And if you violated the conditions of your supervised release, you would go to prison for up to two years, as well as the possibility of an additional term of supervised release.  Each one of those counts also carry with it a $100 special assessment.

The remaining counts, Counts Ten through Fourteen, are aggravated identity theft charges.  And there's a minimum mandatory of two years of imprisonment that has to be served consecutively to any other term of imprisonment that you might get on the previous nine counts.  And along with that there's also a $250,000 fine and a special assessment of $100 per

count.

Thank you, Your Honor.

THE COURT:  So do you understand the charges contained in the indictment?

THE DEFENDANT:  Yes, sir.

THE COURT:  And do you understand the minimum and maximum penalties you face for each count?

THE DEFENDANT:  Yes, sir.

THE COURT:  Is there any reason why the defendant should not enter a plea at this time?

MS. SHELDON:  Not at this time, Your Honor, there is no legal reason.  And we would enter pleas of not guilty to all charges.

THE COURT:  The Court will enter a not guilty plea on your behalf to each of the charges contained in the indictment.

And I have here a Notice of Acceptance of General Discovery; is that correct?

MS. SHELDON:  Yes, Your Honor.

THE COURT:  And the case is set in front of Judge Schlesinger.  And I set it for the March trial term beginning March 4th with a status conference on February 21st at 1:30.

And when will the government be prepared to provide discovery?

MR. CANNIZZARO:  Your Honor, I anticipate us producing a vast percentage of the discovery by next Wednesday.

I've talked with Ms. Sheldon already.  Most of the discovery is already on USAFx, so it would just be a matter of me figuring out the best way to transmit it to her.  But I think by Wednesday she will get a large percentage of it.

THE COURT:  Set the deadline for any discovery or suppression motions for February 15th.

And is the government willing to do a reciprocal exchange of witness lists and Jencks Act material?

MR. CANNIZZARO:  We are, Your Honor.  We'd ask for five business days prior to trial.

THE COURT:  Do you agree to reciprocate?

MS. SHELDON:  Yes, Your Honor.

THE COURT:  As required by Rule 5(f), the United States is ordered to produce all exculpatory evidence to the defendant pursuant to *Brady v. Maryland* and its progeny.  Not doing so in a timely manner may result in sanctions, including exclusion of evidence, adverse jury instructions, dismissal of charges, and contempt proceedings.

Is the government seeking detention?

MR. CANNIZZARO:  We are, Your Honor.

THE COURT:  Are the parties ready to proceed?

MS. SHELDON:  Yes, Your Honor.

THE COURT:  All right.  Mr. Cannizzaro.

(Pause in proceedings.)

MR. CANNIZZARO:  Thank you, Your Honor.  I would like

to basically argue the reasons for detaining Mr. Urban.  I'd like to go over the (g) factors to be considered, and I'll go over each one of those in turn.

The first factor, Your Honor, (g)(1), the nature and circumstances of the offense charged.  Specifically, this is a conspiracy offense under Title 18, United States Code, Section 1343, wire fraud.  Along with that there are substantive wire fraud counts.

And basically the indictment alleges theft to the tune of about $800,000 from multiple victims.  These victims are across the United States.

The reason why we charged this particular offense here in the Middle District of Florida is because there was a search warrant that was issued back on March 1st of this year on Mr. Urban's Palm Coast residence.

THE COURT:  Last year.

MR. CANNIZZARO:  I'm sorry.  Yeah.  That's right, Your Honor.  We're in 2024.  So the search warrant was issued March 1st of last year, in 2023.

When agents arrived at the residence, it was quite apparent that Mr. Urban had his computer -- he was not at the residence.  The computer was set up and it was downloading some sort of software to pretty much install additional -- additional passwords that would then subsequently delete that computer.  So basically the FBI kind of got everything right at

the nick of time.

He was alerted that --

THE COURT:  It would delete the information?

MR. CANNIZZARO:  That would delete the information, Your Honor, that is correct.

And in a forensic search of the computer that was done subsequent to that search, there were multiple files as well as messaging that was -- that were, in fact, deleted, that we were not able to recover.

And the reason for that, Your Honor, is because the defendant was most likely tipped off because there were other search warrants done of other co-conspirators throughout the United States involving this sort of conspiracy which were done the previous -- previous day.

So all of the crimes that we have charged in this indictment, Your Honor, are based specifically on the information that was found on Mr. Urban's computer in Palm Coast.

So what was on the computer and what was the nature of this conspiracy?

This conspiracy involved what was called SIM swapping, or two-factor authentication.  And basically what that would mean is somebody has a specific email account, and that email account would be linked to a cryptocurrency, basically, bank account, where these particular victims would

be investing in cryptocurrency.  And they would have their money, which would be in cryptocurrency, it would be in what was called a cryptocurrency wallet.

So what would happen is the defendant specifically would gain access to these victims's email addresses.  And once he would have access to these email addresses, then he would go on the Coinbase, which was basically a platform to invest in cryptocurrency, and other cryptocurrency exchanges, and he would attempt to sign on to their specific account.

He would not know the specific password for that account.  So he would know that that particular email was associated with a cryptocurrency exchange.  So basically when he was accessing it, he could say, "I forgot my password."

And Coinbase would then say, "Okay.  Well, we will send you a one-time password to your email address."

So once that was done, once Coinbase, or whatever other cryptocurrency exchange, sent that email back to what Coinbase thought was a suspected victim that just forgot their password, he was given a one-time password.

THE COURT:  He was using somebody else's email address?

MR. CANNIZZARO:  Correct.  He had access to somebody else's email address.  That was the specific allegations that we alleged in the wire fraud counts.  So the wire fraud counts are going to be him accessing the email.  And then once he was

able to access the email, get that one-time password, he would then sign on to that specific website.  He would then be able to see all the funds that were available to him.  And he would transfer the victim's cryptocurrency into his own cryptocurrency wallet.

And all of those victims that are listed in the indictment, Your Honor, all five of them, all of that information was found directly on Mr. Urban's computer.

So all of those victims basically were exploited. And all of their money, whether it was Ethereum or Bitcoin, was taken from their bank accounts into Mr. Urban's bank accounts.

And the money that we have alleged that Mr. Urban took and stole from those victims are -- were frozen and they were seized and now they are, you know, in a safe place.

So that's the specific offense.  That's what he did and that's how he was able to get the money from the victims.

All of those victims have been contacted and they said they had no idea about these transfers.  They never -- they don't even know who Mr. Urban is, obviously.  And they never gave him permission to access any of these accounts.

THE COURT:  How was he able to use other people's email addresses?

MR. CANNIZZARO:  So he had to -- so as part of the conspiracy, they would try to fish out or find people's email addresses that were connected to these exchanges.  So it

involved a lot of reviewing multiple -- these are only five of the victims listed.  But there was a variety of different email addresses of different people that were sought out.

So, for example, if they found one person's email address, the significance to them would be could they link that email address to the specific exchange in order to get the cryptocurrency from that particular victim.  So they were able to do that.

THE COURT:  How do you co-op somebody else's email address is what I'm saying.  I mean, I know plenty of people's email addresses, but I can't access them.  Somehow it got hacked into or . . .

MR. CANNIZZARO:  Exactly.  They were able to have access to that person's specific email accounts.

And some of it -- as far as the cryptocurrency exchanges, there was additional safeguards set up where in order to complete a certain transaction, the cryptocurrency exchange would require a photo picture; photo picture of someone's ID.

And on this particular defendant's computer, it was found these identification documents, most of them driver's licenses, which, in fact, were fraudulent.  But because the software employed by these cryptocurrency's exchanges would just basically look at a driver's license and say, "Oh, that looks like him in his photo driver's license, it's valid," it

would then process the transaction.

So there were multiple, multiple ways of hacking into someone's identity and then using that particular person's identity in order to gain entry into that particular exchange in order to take the cryptocurrency.

So the United States feels that the -- the evidence is fairly strong. All of the evidence was actually found on the defendant's computer. The defendant actually admitted to some of the theft in previous conversations with the government.

After -- basically after the March 1st search warrant there was several -- there was a meeting between the defendant and some of the law enforcement authorities out in Oregon where he pretty much was untruthful in a variety of circumstances, one being that he would not have access to cryptocurrency and one being that he would not commit any additional crimes. However, that was not true.

And it is found that basically during the -- during some of the proffer interviews it was estimated that Mr. Urban, as well as his co-conspirators, have stolen approximately 10 to $15 million between late 2020 and early 2023.

Now, I know in our indictment, Your Honor, we start -- our indictment starts when the defendant turned 18. And the United States is well aware that this particular defendant does not have any other sort of arrests or criminal

history.

However, it's the United States's position that he has been actively involved in very similar type of conduct prior to the date of this indictment, even earlier, before his 18th birthday.  We believe it was probably around when he was about 16.

As far as the additional factors, the serious risk that the defendant will --

THE COURT:  Let me back up for a minute.  So you're saying he met with authorities in Oregon?  When was that?

MR. CANNIZZARO:  That was in May of 2023.

THE COURT:  And then you're saying that he told them he wasn't going to commit any further crimes but he did?

MR. CANNIZZARO:  Correct.  He said he wasn't going to be involved in any other criminal episodes and he did not have any access to cryptocurrency.

However, in August 2023 he withdraw about $10,000 worth of Bitcoin from an online account which was known to investigators at the time.  And that was something that he advised investigators that he would not do.

He also sent messages -- he was also advised not to communicate with other co-conspirators involving this particular offense.  However, there were Discord messages where he sent -- Discord's kind of like a messaging type app -- "I talked to" -- where he messages them, "I talked to a fed

attorney today.  They say if I don't get charged soon, there's a good chance I beat the case.  You have no idea how -- expletive, blank -- I would be if I didn't initiate nuke mode."

I don't really know what "nuke mode" means, but he was talking to his other co-conspirators.

And then afterwards he sent some additional information to the co-conspirators specifically saying, "The FBI has" -- "has the encrypted VeraCrypt."

VeraCrypt was the type of method that he was able to store some of the passwords on his computer.  There was a variety of different types of applications that were all password.

And, "I'm the only one" -- and he also stated," I'm the only one who can unlock it."

And this was actually untrue.  The FBI was actually able to unlock it.

He also discussed to his co-conspirators a, quote/unquote, plea deal that he claimed he was offered, which that never happened.

He further communicated to them, "I got offered a plea deal today.  Full cooperation for no prison time and probation.  I said no."

So all of that, Your Honor, was post the search warrant while he was talking to the authorities.

And we were doing all that in good faith.

And he told investigators he wasn't going to have any access to cryptocurrency, which is not true, and he also was not going to talk to his co-conspirators, which he did.

Going to the specifics of flight as well as obstruction, the defendant does not have a job. The defendant is not employed. There is no history whatsoever of the defendant ever having employment.

He was staying at an Airbnb under an alias name. In fact, it was a matter of sheer luck that the FBI was actually able to locate him.

The FBI was able to look at different IP addresses that potentially linked to Mr. Urban and/or other co-conspirators, and it came back to a specific Airbnb.

When they went to research the Airbnb, lots of times it will say this Airbnb -- you know, there's a profile that makes a reservation for an Airbnb.

And Airbnb is -- I don't know if Your Honor is aware of this or not, but an Airbnb is just another way to reserve a room for like a -- possibly like a hotel, but it's someone's home that they may rent out. So that's what an Airbnb is.

So in this particular case, Your Honor, Mr. Urban was living from Airbnb to Airbnb.

And in order to purchase an Airbnb, or to reserve an Airbnb, you have to have a profile. You have to be registered on this particular website.

Well, Mr. Urban was not registered under Airbnb as "Mr. Noah Urban," it was some alias. And in fact, the profile picture was a cat, which was a little bit interesting because the FBI agent thought, well, I think that was the same cat that was at the search warrant back in March of 2023. That was the only reason why they specifically went to that particular Airbnb in Volusia County.

Well, when they arrived at the Airbnb in Volusia County, they're able to locate the owner, who said yes, this particular person stayed at this particular Airbnb, and in fact, he's still there.

And they asked him how he paid -- "How did he pay for the Airbnb?" And it was all paid on the platform.

So we have no idea at this point where he's coming up with the money to pay for this.

THE COURT: What platform?

MR. CANNIZZARO: The Airbnb platform.

So you would basically -- if you were to make a reservation, Your Honor, you'd go to Airbnb.com and say, okay, I want to stay in this particular beach house or something. It's going to be $300 a night. Okay, you know, pay on that particular website.

So the owner of the Airbnb had no idea -- he knew he was getting paid, obviously, by the company, but he had no idea -- and I don't think he would be able to find out -- how

exactly Mr. Noah Urban paid for the Airbnb.

THE COURT:  The alias.

MR. CANNIZZARO:  I do not have that information, Your Honor.  But it wasn't something like -- it wasn't something that the FBI was immediately thinking it was going to be Mr. Noah Urban.

So when they go to the particular Airbnb, they arrest him.  They find a computer.  They find a cell phone.  We have not searched that yet, but we're in the process of getting it transported from the Daytona Beach field office to the Jacksonville field office, where I anticipate we'll do a search warrant on the phone and the computer.

Additionally, there were some high-end Louis Vuitton sneakers, or Gucci sneakers, some sort of high-end materials, $200 cash.  But that was really it as far as what they found on him when they arrested him.

But the fact of the matter is that he has been avoiding -- avoiding any -- any sort of footprint of his own name.  And we think that's because we know that he probably knew that he was indicted.  Of course, the indictment was under seal.

But we think that he is -- he is a risk of flight. He has made mention, or there has been made mention that there are other co-conspirators in other countries, the United Kingdom as well as New Zealand, some of which, at least in

previous discussions, have discussed or suggested to Urban that he could leave the United States to avoid arrest, slash, investigation.

As I stand before you, Your Honor, today, we haven't uncovered any particular type of a plot or a plan for him to do that. However, it's important to note that there are co-conspirators all throughout the United States as well as the world.

As far as a serious risk that such person will obstruct justice, I think it's important to note, Your Honor that -- the United States would be the first person -- the first entity to say that these offenses were nonviolent. However, Urban has consistently used technology to evade detection and thwart investigations, including VPNs, encrypted communication, and the laundering of this cryptocurrency.

All of these offenses can be carried out simply with a laptop and a free or low-cost software. And they're very difficult to detect and attribute absent months of intense investigation, which this has taken quite some time for the FBI to develop.

And it's the United States's position that if he is released, he can return very quickly to carrying out additional offenses given his likely -- his rapid return to crime following the search warrant.

So Your Honor, for all these reasons we are asking

you to detain him pending trial.

Thank you.

MS. SHELDON:  Your Honor, we have two potential proposed third-party custodians that we'd like to call as witnesses in this case.

If I could first call Robert Urban.

COURTROOM DEPUTY:  Please raise your right hand.  Do you solemnly swear or affirm that the answers you will give during these proceedings will be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

**ROBERT URBAN**, **DEFENSE WITNESS**, **SWORN**,

DIRECT EXAMINATION

BY MS. SHELDON:

Q.   Good afternoon, Mr. Urban.  Can you please spell your name for the record.

A.   It's U-r-b-a-n.

Q.   And how do you know Noah Urban?

A.   He's my son.

Q.   It's my understanding he's your only child?

A.   That's correct.

Q.   And if he were to be released, could he come live with you?

A.   Yes, he can.

Q.   Where do you live?

A.    I live in Deland, Florida.

Q.    Okay.  And has he lived with you before?

A.    Yes, he has.

Q.    Is there a room for him?

A.    Yes.

Q.    Who else lives in your home?

A.    The -- my girlfriend and the -- her -- her two -- her two children.

Q.    Do you have any firearms in your home?

A.    Yes, I do.

Q.    Would you be willing to get rid of those firearms if Noah was allowed to live with you?

A.    Yeah.  I've already discussed that.

Q.    Can you tell us about the internet access you have in your home.

A.    Absolutely.

        The -- I work from home.  I have a small business. And so I actually have an office myself that's password protected.  Get on the password.

        I deal with sensitive information from some of the people that I work with in marketing and advertising, and so -- but that's a siloed computer from that.

        And I have a couple tablets and everything that are also strewn through.

        So the internet access is on Spectrum.  And actually,

the government has a search warrant on any sort of internet access on our property as well already.

Q.    Would you be willing to restrict that internet access from Noah?

A.    Yes, I would.

Q.    And how would you do that?

A.    The -- I would password protect it and I would be able to encrypt it, and physical security of the -- "Hey, you're not allowed in here."  You know, "If you do, then that's a breach of my trust and I have to make phone calls."

Q.    As far as your status about working from home, are you home most of the time?

A.    Yes, I am.

Q.    What -- does your girlfriend work out of the home?

A.    She's a teacher.

Q.    As far as a risk of flight, do you have any significant ties outside the United States?

A.    I served in the United States Marine Corp.  I'm a master mason.  I'm a doctor.  Not a medical doctor, I'm earth and environmental science.  I have ties all over the place.  But all of those people are people of honor that if anything nefarious or anything -- there's no negative ties internationally anywhere.

Q.    Would you be willing to surrender Noah's passport?

A.    Yes, I would.

Q.    Do you have it?

A.    Yes, I do.

Q.    As a third-party custodian you may be asked to monitor the whereabouts of your son.  And if he does not stay where he's supposed to, you would be required to turn him in to the Pretrial Services.

Is that something that you'd be willing to do?

A.    Yes, I would.

Q.    Even knowing that that could put him in trouble?

A.    He would understand that as well.

Q.    Do you have any reservations now that you know the full extent of what the charges are?

A.    Out of all the titles that I mentioned, "Dad" is the most important one.

The allegations against Noah, this reprehensible criminal mastermind, 19 years old -- he's incredibly brilliant. The -- but at the end of the day, he's right off the starting gate.

I'd have no -- no problem spending more time before he gets on this journey and takes the next steps, whatever those might be.

Q.    It's my understanding that you actually accompanied Noah to the proffer in Oregon in May; is that correct?

A.    That's correct.  So I paid for my own flight, the hotel. I dropped him off, and several FBI agents and the public

defender out there took him -- took him.  And I saw him back at the hotel.

That occurred for three nights and then we flew back awaiting word.

Q.   Were you aware there was an indictment or that they were looking for him?

A.   No, I was not.

The -- the attorneys and the FBI had my phone number. The FBI agent called me December and confirmed Noah's phone number that I had for him.  I was never asked to contact Noah. I was never asked to get him in touch or anything.

Noah's never not answered my phone whenever I've called.

Q.   And can you provide any reason to the judge why he may have been staying in Airbnbs instead of with you?

A.   The -- we were -- we were given the assumption the -- his -- his house was raid -- was raided in March.

We were given the assumption of -- first-time parent, of:  My son can be arrested any day.  Are the cops coming through the door?

And we're told, "Hey, you know, you can probably expect about July or August."

So when August rolled around, he goes, "What am I doing?  I'm sitting here.  This could be years; this could never happen."

He wasn't charged; we wasn't arrested.  He goes, "Dad, I'm an adult."  And he goes, "I'm not doing anything here with my life."

And I said, "Well, what's your plan?"

"I'll figure it out."

"All right.  Well, I love you."

Q.   Had he been doing any work for you?

A.   No, nothing -- nothing serious.  The -- he's incredibly good at typing, and so the -- he may transcribe a blog or something for me, but nothing paid or nothing serious of any continued nature.

Q.   And while he stayed with you, would you be providing financial support for him?

A.   Yes, I would.

Q.   If you noticed any large expenditures or withdrawals of money, would that get your attention?

A.   Absolutely.

Q.   And is that something that you'd be willing to report to Pretrial?

A.   Yes, ma'am.

MS. SHELDON:  Please answer any questions that Mr. Cannizzaro may have for you, or Your Honor.

THE COURT:  Mr. Cannizzaro.

MR. CANNIZZARO:  Thank you, Your Honor.

THE COURT:  Mr. Cannizzaro, can I clarify something?

So the search warrant, was that executed at a different house that -- or was that at the house where . . .

MR. CANNIZZARO:  The search warrant was executed in Palm Coast.

THE COURT:  Palm Coast.

MR. CANNIZZARO:  I believe -- and we could probably get Mr. -- I'm sorry.  We could probably get Dr. Urban to talk about that he was previously living with him in Deland, Florida.

Is that --

THE WITNESS:  That's correct, sir.

MR. CANNIZZARO:  Okay.

CROSS-EXAMINATION

BY MR. CANNIZZARO:

Q.   Okay.  Good afternoon, Dr. Urban.  My name is John Cannizzaro.  I'm the prosecutor on the case.  I just had a couple questions for you.

You said that Mr. -- or your son was -- would always pick up -- or you would always pick up the phone or you would always be able to communicate with him on the phone.

Did you know his phone number?

A.   Yes, I did.

I know that he got a new phone and had -- subsequently over the years, anytime he got a new phone, he -- "Hey, this is a better rate, better charge.  Here's my phone

number."

Q.    He didn't contact you on like a Google voice number or anything like that?

A.    It might have been, but I had the number that -- I'm not necessarily aware of any time that he would have called me what that number was at.  But anytime I needed to contact him, I could always do that.

Q.    Okay.  And I know you said that you kind of had like your -- the last time you spoke with him when he was living in the Palm Coast residence, he kind of was like, "Okay, I'm going to kind of figure it out."

Did he tell you that he was living in Airbnbs?

A.    To be clear, Palm Coast was March of 2023.  The Airbnb was August of 2023 on.

So whenever -- in August, he goes, "Hey, I'm going to figure it out.  The" -- you know, "I have some things I want to work on."

And so yes, he did inform he -- I did know that he was living in Airbnbs.

Q.    But it wasn't the same Airbnb; it was multiple different Airbnbs?

A.    That's correct.

Q.    So it wasn't just like, "I've decided to live in this particular" -- "one particular location."  It was multiple locations?

A.    One of the -- one of the -- Airbnb is typically a couple days or a weekend rental.  So to find an Airbnb that has a long-term rental of a 30-day plus, I didn't even know that they did that.

So he said, "Hey," you know, "this one only allows for 30 days, so I'm going to stay here."  You know, "I want to travel a little bit and the" -- "as soon as the 30 days is up" -- so I talked to him several different locations.

Q.    And do you know if he did any sort of foreign travel?

A.    The -- we've been out -- we've been out of the country a couple times on vacation, but nothing foreign -- nothing in the last two years that I'm aware of.

Q.    And Dr. Urban, I'm sorry, I wasn't being specific.

When he told you, just like you told us, he was going to travel, where was it that he was traveling to?

A.    The -- he had talked about Miami and Tampa.

Q.    Okay.

A.    The -- nowhere international.

Q.    Okay.  Gotcha.  Okay.

And I think you told us that you do currently have his passport?

A.    Yes, I do.

Q.    Okay.  And fair to say -- I know you told Ms. Sheldon that he may have done some work for you, like typing blogs or something, not for money, but you don't have any idea of him

actually having any type of employment ever?

A.    That's correct.

Q.    And you were not giving him money to stay in these areas?

A.    No, I was not.

Q.    Okay.

A.    The -- you mentioned the Guccis, though.  That was a gift from me.

Q.    Oh.  You gave him the Guccis?

A.    Yes.

Q.    Okay.  Gotcha.  Okie-dokie.

There also was -- at the search warrant at his -- the Palm Coast residence there was a firearm.  Did you give him that firearm?

A.    Yes, I did.

Q.    You did?  Okay.  And what type of firearm was it?

A.    The -- to my recollection, I believe it was a -- it was either a shotgun or a handgun of -- living on the zone, the -- it was mine.

Q.    The firearm was yours?

A.    Yes, it was.

Q.    Okay.  And where did you purchase it?

A.    The -- at Shoot Straighter.  Completely registered to my knowledge.

Q.    Well -- well, I mean, to your knowledge.  I mean, do you recall going into a firearms dealership --

A.    Yes.

Q.    -- and filling out --

A.    I -- I have multiple guns.  Some were a gift from my grandfather or father who passed away.  But I don't know this specific one, which one it was.

Q.    But you know it was from you?

A.    Yes, sir.

Q.    So if we did a trace on the firearm it would come back to you?

A.    That's correct.

Q.    Okay.

      Now, you told us about when it comes to Airbnbs that you found it strange that someone would have the ability to stay in an Airbnb for more than 30 days.

      I don't know about Airbnbs, but isn't it true there are a lot of other places you could stay besides an Airbnb?

A.    Of course.  There's always rentals that you can find.

Q.    And Airbnbs are kind of probably on the higher end of places you're going to stay?  If I had to stay in a temporary place and I didn't have any money, fair to say going on Airbnbs would probably not be the way to go?

A.    It's been my experience that that was historically true, but there's a lot more income levels across the board on Airbnbs now.

Q.    So you think that an Airbnb would be cheaper than staying

at a hotel or a motel for like an extended amount of time?

A.    I don't have the appropriate answer from statistics, but I think that there's probably something comparable on both ends.

Q.    But clearly the multiple staying in Airbnbs wasn't due to any sort of job or anything of that nature?

A.    That's correct.

Q.    Okay.  Now, I think you told us that he once -- he previously lived -- I imagine he previously lived with you at some point?

A.    That's correct.

Q.    And what was the reason that he was no longer living with you?

A.    The -- he had -- he had finished high school.  Just being a teenager, you know, applying pressure, "What are your plans? What are your goals?  What are the next steps?"  You know, "You can't just sit around here."

      So the -- I think that as a parent, just applying pressure and him not wanting to experience that pressure of "you can't just do nothing."

Q.    And when he lived in the Palm Coast address -- I know you kind of made mention of the search warrant and everything -- was that your residence or was that his residence?  How did that work when it comes to --

A.    So the -- he had just turned 18 years old and that was his rental residence.  So no cosigner or anything.  He had made an

agreement.  He had found the place and that was completely his.

Q.    So he was paying rent.  He wasn't paying you rent?

A.    That's correct.  He was paying the owner rent for the house.

Q.    Okay.  And do you happen to know what the rent was?

A.    That -- I'm not sure.  I don't have the exact number.

Q.    Okay.  But you were not involved -- but fair to say you weren't paying any of that rent?

A.    That's correct.

Q.    It was all him paying rent.  And, again, he doesn't have a job?

A.    Yes, sir.

Q.    Okay.  Okie-doke.

      Did he ever ask you for money for rent?

A.    No, nothing for the -- nothing for rent or anything like that; of, "Hey, Dad, can you give me 20 bucks for gas?"  Or, you know, "Can you do this?"

      Normal question that a teenager would ask his father.

Q.    I know you -- one of the things you said is you said you're a dad first, and you described your son as brilliant. And you told us about some additional security features you could put on your home wifi and everything like that.

      But you would agree with me that your son is very smart, with the possibility that he could potentially find out those passwords and possibly use your internet and your wifi?

A.   That's describing my intelligence.

Q.   I don't mean to discredit your intelligence, Doctor, but I'm just saying, from what you told us, he's a very smart individual, right?

A.   Yes, yes.

Q.   Thank you.

MR. CANNIZZARO:  I don't have any other questions for the doctor.  Thank you.

MS. SHELDON:  Your Honor, I don't have any redirect for Dr. Urban.

I would call Jennifer Walck.

THE COURT:  Okay.  You can step down.  Thank you.

THE WITNESS:  Thank you, Your Honor, counsel.

THE COURT:  Okay.  What was the name again?

MS. SHELDON:  Jennifer Walck.

THE COURT:  Walck.

COURTROOM DEPUTY:  Do you swear or affirm that the answers you will give during these proceedings will be the truth, the whole truth, and nothing but the truth, so help you God?

MS. WALCK:  I do.

- - -

**JENNIFER WALCK, DEFENSE WITNESS, SWORN,**

DIRECT EXAMINATION

BY MS. SHELDON:

Q.    Ms. Walck, can you please spell your name for the record.

A.    W-a-l-c-k.

Q.    And how do you know Noah Urban?

A.    I'm Mom.

Q.    So he's your son?

A.    Yes.

Q.    And it's my understanding that you have agreed to be an alternate third-party custodian for Mr. Urban?

A.    Yes.

Q.    If the judge were to allow you to be a third-party custodian, where would you propose that Noah lived?

A.    I currently have a vacant condo.

Q.    And is it that -- in this area close to the Middle District of Florida?

A.    I live in Sanford, and that is about 15 minutes away from the condo.

Q.    And can you tell us a little bit about the condo, like what the bedroom situation is like, what kind of --

A.    It's a two-bedroom, two-bath, you know, family room, kitchen, absolutely no internet, and electricity and water.

Q.    Is it furnished?

A.    Not at this time.

Q.    If Noah were to stay there, is there anyone else who would stay there with him?

A.    I would stay there with him at times.  My mother has

already agreed for as long as I need her that she can also come to help.

Q.    And your mother is not employed, she's retired?

A.    She is retired.

Q.    Okay.  Same sort of questions:  Are there any firearms in that condo?

A.    No.

Q.    Do you know if there's any, like, general wifi capability for the whole condo, if they have open wireless internet access?

A.    It would have to be connected, turned on, installed.  It's not -- I mean -- yeah.

Q.    Are there any other computers or other electronic devices in the condo?

A.    No.

Q.    If you got wind that your son was withdrawing amounts of money or accessing the internet without permission, would you be willing to turn him in to the Pretrial Services division?

A.    Absolutely.

Q.    It's my understanding that your son has not lived with you for a few years?

A.    Correct.

Q.    When is the last time that you and Noah lived -- or when's the last time he stayed with you?

A.    I -- you know, we visit.  He would go to dinner, that kind

of thing, but he hasn't lived with me probably since he was 16.

Q.    Okay.  And it's my understanding that you were sort of unaware of the situation until the FBI raid occurred in March?

A.    Correct.

Q.    And is there anything else that you would like to tell the Court about your proposed living arrangements?

A.    I would probably want him doing some counseling, things like that.  Yeah, I don't -- I don't know anything else.

Q.    Okay.  And Ms. Walck, what do you do for work?

A.    I am a director in the HR talent space.

Q.    And you have the ability to take time off or to supervise him at least to some degree?

A.    Yes, yes.  I do work.  I work from home, which would be 15 minutes away, but I would either be there at night or -- I would be checking in regularly.

            MS. SHELDON:  I don't have any further questions for Ms. Walck.  Mr. Cannizzaro may have some.

            MR. CANNIZZARO:  Yes, Your Honor.

                        CROSS-EXAMINATION

BY MR. CANNIZZARO:

Q.    Good afternoon.  Is it Ms. Walck?

A.    Walck.

Q.    Walck, okay.  My name is John Cannizzaro.  I'm the prosecutor in the case.

            So if I understand what you were telling us,

Mr. Urban lived with you until he was about 16 and then he moved in with his dad?

A.    Correct.

Q.    And then he moved into this -- the Palm Coast address?

A.    Correct.

Q.    Did you know about him going -- leaving his dad and going to the Palm Coast address?

A.    He told me he was.  I -- at first I didn't even get to know where he was living.

Q.    Okay.  And why was it that he was not -- that he -- was he kicked out at 16?  Or tell us what happened there.

A.    He would not agree to follow my rules and he ended up going to stay with Dad.

Q.    Okay.  Was there a specific rule that was broken?

A.    I did not trust him on computers.  I did not trust him with regard to school.

Q.    Why didn't you trust him with computers?

A.    We had been having a hard time most of his childhood with -- he has multiple diagnoses, one of which is, like, oppositional defiant disorder.  So behavior has been challenging.

        At the point where he left, I needed to enforce stricter rules and he wasn't willing and he chose to go live with his dad.

Q.    Gotcha.  And I imagine -- you told Ms. Sheldon that

counseling would probably be appropriate.  Is that what you were referencing?

A.    Oh, yes, yes.

Q.    But what about -- okay.  So I understand you're saying he was diagnosed of different sort of conditions, but what specifically about computers made you worried about your son? What specifically?

A.    Being secretive, playing games, being up at night, not wanting me to check in on him.

Q.    Okay.  Thank you very much, Ms. Walck.  I appreciate it.

THE COURT:  Any other questions?

MS. SHELDON:  Your Honor, I don't have any other questions for Ms. Walck.  I don't know if Your Honor had any questions for Ms. Walck.

THE COURT:  I don't.  Thank you, ma'am.  You can step down.

MS. SHELDON:  Your Honor, just by way of argument, I would note that this is not a presumption case, so the government has a significantly higher burden to show that Mr. Urban is a serious risk of flight, not just an ordinary risk of flight.  So serious risk of flight would indicate some kind of great likelihood that he would fail to appear or make himself known to court.

What we know about Mr. Urban is that he did agree to voluntarily go out and sit down with prosecutors.  He made

himself available to the government for questioning.  He did not resist arrest.  He participated and was taken into custody without incident.  They did not notify him that the warrant had been issued.

But during the period from March and May on he has not left the country.  He has not gone into hiding.  What he's been doing is sort of bouncing around being transient.

I think that this Court could put some strictures on his movement into place with a third-party custodian, or potentially GPS, so that we know where he is, know where he's staying, in a stable residence with a parent, that he's being checked in on, that they're monitoring sort of what he's up to to make sure that he is not violating the Court's order.

We do have an option for him where there is no internet, there's no computer, there's none of those devices where that could potentially tempt him to violate an order of the Court.

As far as to obstruct justice, there's been no evidence that he's threatened any government witnesses, that he's encouraged anyone not to testify, or that he has been a danger to any of the witnesses in the case.  It seems to me more of impulsive sort of teenager behavior in talking about these incidents on the internet with his friends, who are his co-conspirators.  But at the time that he made those statements he was not under a court order.  He has no prior record of any

kind.

And we do believe that there are some conditions that this Court could place on him to ensure that he was not a serious risk of flight nor that he would obstruct justice.

I mean, it's a pretty big deal to be taken into federal custody and to go to jail at 19 years old. And I think that Mr. Urban has recognized this as a significant problem. And he clearly has family who is here and willing to support him and hopefully get him back on the right path.

But as far as the government proving by either a -- even a preponderance that he's a serious risk of flight and not just an ordinary risk of flight, these are nonviolent fraud-related offenses with no threats of violence to anyone in the community, no use of firearm, no drugs. There's no history of drug use or abuse.

And for all of those reasons we do not believe that the government has met its burden to show that there is no condition that this Court could put on Mr. Urban to see that he did return to court and did not cause any obstruction to justice in this case.

THE COURT: I am going to grant the government's motion for detention. I think the government has shown by a preponderance of the evidence that the defendant is a serious risk of flight and he is a serious risk that he will obstruct justice.

From the government's proffer, it sounds like he was trying to obstruct justice at the time the search warrant was executed.  He was downloading software to delete information off of his computer.

I'm concerned about a number of things, both from the government's proffer and from the Pretrial Services report. Obviously the use of an alias is extremely problematic, especially when you know that there may be potential criminal charges against you.

He has no employment history whatsoever.

When he came to court he said he had no address.  He told Pretrial Services that he had no fixed address, which was true, but it's concerning.

According to the Pretrial Services report, he related that he could not recall that he had traveled outside of the United States.  I don't understand that at all, how somebody could not recall if they've been out of the country.

He declined to answer any detailed questions about his financial situation, which he has a right to do, but he obviously has financial means.

And the nature of these crimes, although he's young -- obviously extremely young -- is so sophisticated that it certainly makes me very concerned that he's going to either flee or seek to obstruct justice in some way.

Of course, his communications with his alleged

co-conspirators are concerning as well, although he told the government that he wasn't going to do that.

So another thing, he said he couldn't provide a urine specimen.

I mean, it's just a pattern, it seems, of not being straightforward and attempting to hide whatever situation is going on with him.

So I know he's young, and I'm not doing this lightly, but I'm going to grant the government's motion for detention.

Is there anything further to take up?

MR. CANNIZZARO:  No, Your Honor.

THE COURT:  Ms. Sheldon?

MS. SHELDON:  Not at this time, Your Honor.

THE COURT:  All right.  Court will be in recess.

COURT SECURITY OFFICER:  All rise.

(Proceedings concluded at 4:30 p.m.)

-     -     -

CERTIFICATE OF OFFICIAL COURT REPORTER

UNITED STATES DISTRICT COURT)

MIDDLE DISTRICT OF FLORIDA )

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

DATED this 15th day of March, 2024.


/s/ Katharine M. Healey
Katharine M. Healey, RMR, FPR-C
Official Court Reporter